**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION**

| | | |
|---|---|---|
| **ANFINY J. ESHOO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** |
| **vs.** | ) | |
| | ) | |
| **THE VILLAGE OF ARLINGTON HEIGHTS,** | ) | |
| | ) | **JURY DEMANDED** |
| **Defendant.** | ) | |

---

**COMPLAINT**

The Plaintiff, ANFINY J. ESHOO, through his attorneys, HOLMAN &
STEFANOWICZ, LLC, complains of the Defendant, THE VILLAGE OF ARLINGTON
HEIGHTS, as follows:

**INTRODUCTION**

1.      This action seeks redress for the improper termination of the Plaintiff's
employment and wrongful discrimination in employment by the Defendant, THE VILLAGE OF
ARLINGTON HEIGHTS, in violation of the Plaintiff's rights of equal protection in violation of
Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 *et seq.* ("Title VII"), in
violation of his rights under The Family Medical Leave Act ("FMLA"), as amended, 42 U.S.C. §
2601, *et seq.*, and in violation of the Illinois Human Rights Act ("IHRA") 775 ILCS 5/1-101 *et
seq.*

1

## JURISDICTION AND VENUE

2.      This Court has jurisdiction of the Federal claims herein pursuant to the provisions of Title VII, 42 U.S.C. §§ 2000 *et seq*., the provisions of the FMLA, 29 U.S.C. § 2601, *et seq*., and 28 U.S.C. § 1331.  For the supplemental Illinois claims, jurisdiction is conferred upon the Court by 28 U.S.C. § 1367.

3.      On or about August 28, 2019, the Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR").  On or about January 8, 2020, said Charge of Discrimination was amended.

4.      On or about August 6, 2020, the EEOC issued the Plaintiff a Notice of Right-to-Sue on his EEOC Charge, as amended.  (A copy of the Plaintiff's Notice is attached as "Exhibit A.")  The Plaintiff's cause of action was filed within 90 days of receiving his Notice of Right-to-Sue.

5.      Venue herein is proper under 28 U.S.C.A. § 1391(b).  The unlawful practices complained of occurred within this District, the employment records relevant are maintained and administered within this District, the Plaintiff is a resident of this District, and the Defendant's principle place of business is within this District.

## PARTIES

6.      The Plaintiff, ANFINY J. ESHOO ("ESHOO"), is a male citizen of the State of Illinois, residing in the County of Cook, and is of Assyrian ancestry, his parents having immigrated from Iraq.  As an Assyrian, ESHOO is protected by Title VII and the IHRA from adverse employment decisions and/or actions "because of" or "on the basis of" his national origin and race, dark olive.

7.      The Defendant, THE VILLAGE OF ARLINGTON HEIGHTS, ("ARLINGTON HTS.") is an Illinois Home Rule Municipality under the laws of the State of Illinois. ARLINGTON HTS. consists of numerous departments, one of which is the ARLINGTON HEIGHTS POLICE DEPARTMENT (the "POLICE DEPARTMENT").

8.      From on or about May 24, 2016, through January 6, 2020, ESHOO was an employee of ARLINGTON HTS. as defined by Title VII, 42 U.S.C. § 2000e(f), and as defined by the IHRA, 775 ILCS 5/2-101(A).

9.      At all times relevant hereto, ARLINGTON HTS. is and remains an employer as defined by Title VII, 42 U.S.C. § 2000e(b), and as defined by the IHRA, 775 ILCS 5/2-101(B).

## FACTS

10.      On or about May 24, 2016, ESHOO was hired by Defendant, ARLINGTON HTS., as a Patrol Officer with the POLICE DEPARTMENT.  ESHOO was a lateral hire from the Village of Maywood's Police Department, having worked there as a Patrol Officer for over two years.

3

11.     During the term of his employment with the POLICE DEPARTMENT, ESHOO was the only Patrol Officers employed by the POLICE DEPARTMENT with an Assyrian ancestry.  The Patrol Officers employed by the POLICE DEPARTMENT are primarily white of American ancestry.

12.     Almost immediately upon the commencement of ESHOO's employment with the POLICE DEPARTMENT, ESHOO was questioned about his darker complexion and what his national origin was.  When the other Patrol Officers and Command Staff learned that ESHOO was Assyrian from Iraq the derogative comments about ESHOO's national origin and race began.  Throughout ESHOO's employment, ESHOO was subjected to repeated and continuous comments about his national origin and race, which included, without limitation:

   a.     being called and referred to as a "Terrorist;"

   b.     being called and referred to as a "Goat Fucker;"

   c.     being called and referred to as a "Arab;"

   d.     being called and referred to as a "Dirty Arab;"

   e.     being called and referred to as a "Muslim;"

   f.     being called and referred to as a "Dirty Muslim;"

   g.     being called and referred to as a "Camel;"

   h.     being called and referred to as a "Camel Jockey;"

   i.     being called and referred to as a "Sand Nigger;"

   j.     being called and referred to as the "Unabomber;"

4

k.      being called and referred to as "Al Qaeda;"

l.      being called and referred to as "Saddam Hussein;"

m.      being called and referred to as "Dirty Middle Eastern;"

n.      being called and referred to as "Syrian;"

o.      being called and referred to as "Osama bin Laden;"

p.      being called and referred to as "carpet rider;"

q.      being called and referred to as "Aladdin;"

r.      referred to ESHOO's girlfriend, who was also from Iraq, as "Princess Jasmine;"

s.      asked ESHOO if he was dating his "cousin" because his girlfriend was also from Iraq; and asked if it was "an arranged marriage;" and "did you meet at a mosque;"

t.      being called and referred to as the "Taliban."

13.     Almost immediately upon the commencement of ESHOO's employment with the

POLICE DEPARTMENT, ESHOO was criticized by other Patrol Officers and Command Staff

for the vehicle he drove.  ESHOO drove a 2014 Dodge Charger with tinted windows.  ESHOO

was told to "get rid of your shine car, you aren't in Maywood anymore."  ESHOO's car was

called a "ghetto vehicle."  Because of the constant criticism and comments, ESHOO traded his

Dodge Charger in for a white Jeep Wrangler, which the Patrol Officers immediately referred to

as ESHOO's "Barbie Jeep."

14.     ESHOO also owned a 2015 Honda Grom (a small 125cc motorcycle), and when he drove it to work once, ESHOO was harassed by Patrol Officer Kevin Sullivan who stated: "nice clown bike do you park that next to your carpet in the garage?"  ESHOO was also asked "how are you able to fit your camel in your garage."

15.     Patrol Officers would play Muslim music on their computers in the presence of ESHOO, and laugh and make inappropriate comments about ESHOO's national origin.

16.     Management, including but not limited to Police Chief Gerald Mourning, Deputy Chief Pecora, Commander Henderson, Commander Pinnello, Commander Buczynski, Sergeant Mandel, Sergeant McGrath, Sergeant Jasper, Sergeant Mack, Sergeant Sjodin, and Sergeant Nelson which were employees of Defendant ARLINGTON HTS., were present for, participated in, sanctioned and/or allowed the disparaging, demeaning and harassing behavior and comments referenced herein.  Despite management's awareness, such behavior was allowed to continue and no remedial action was taken to stop such behaviors.

17.     On October 30, 2018, ESHOO greeted then Police Chief Gerald Mourning and Village Manager Randall Recklaus as they walked off the elevator into the patrol area of the old Police Department building.  Chief Mourning commented on ESHOO's beard, and said "you look like a terrorist."  This comment was said loud enough were other officers at the front desk and patrol areas were able to hear the Chief's comment.  The comment was quickly escalated throughout the POLICE DEPARTMENT, and ESHOO was referred to and called a "terrorist" or the "terrorist" consistently throughout the remainder of his employment.

18.     On October 31, 2018, ESHOO found in his mailbox located within the Police Department building, a copy of a photograph of bearded terrorist suspects from the 911 bombings (a copy of the photo is attached as "Exhibit B"); and an Islamic brochure entitled "3 Facts About Sikhi" (a copy of the brochure is attached as "Exhibit C"). ESHOO gave the documents to his shift Commander Pinnello, and told him that this behavior needed to stop. Commander Pinnello threw the documents into the garbage, which ESHOO later retrieved, and did nothing to address or stop the improper conduct.

19.     ESHOO often found camel stickers attached to his mailbox located within the Police Department building, and camel stickers placed on his shelf in the locker room located within the Police Department building (photos of examples of the camel stickers are attached as "Exhibit D").

20.     ESHOO found a "goat milking manual" in his mailbox located within the Police Department building (the first page of the 161 page "goat milking manual" is attached as "Exhibit E").

21.     On or about April 18, 2019, on the computer located within the Police squad driven by ESHOO, someone made the wallpaper a picture of a police officer riding a camel (a copy of the photo is attached as "Exhibit F").

22.     On or about May 19, 2019, on the computer located within the Police squad driven by ESHOO, someone made the wallpaper a picture of someone riding a camel (a copy of the photo is attached as "Exhibit G").

23.     In April 2019, ESHOO was instructed by Sergeant Jasper to remove dead cats out of an uninhabitable house.  ESHOO advised the Sergeant Jasper he was allergic to cats.  Sergeant Jasper stated, "then you better wear a hazmat suit."  ESHOO removed the dead cats from the house.  The following day, while discussing the deplorable condition and smell of the house, Commander Henderson said to ESHOO, in the presence of Sergeant Jasper and Patrol Officer Chojnowski, "good thing we sent the dirty Arab in there."

24.     Because of ESHOO's national origin and race ARLINGTON HTS. limited ESHOO's opportunities for career development as compared to his other Patrol Officers that were not Assyrian from Iraq.  ESHOO was improperly denied participation in or promotion to these assignments that severely curtailed ESHOO's ability to advance within the POLICE DEPARTMENT:

a.      Power-Shift position, provided to a Patrol Office with less seniority than ESHOO although it was a seniority-based position.

b.      Denied position of Field Training Officer on two separate occasions.

c.      Denied enrollment in TacMed Instructor course.

d.      Denied enrollment in Firearms Instructor course.

e.      Denied enrollment in the Reed School of Interrogation on two separate occasions.

f.      Denied position of Detective on two separate occasions.

g.      Denied position of K-9 Officer.

25.     Because of ESHOO's national origin and race, ESHOO was also subjected to different and more negative terms and conditions of his employment and was provided reprimands and unjust written disciplinary notices while other Patrol Officers that were not Assyrian from Iraq were not reprimanded for the same or similar acts.

8

26.     On or about April 12, 2019, ESHOO was apprised of charges brought against him arising out of a call that occurred on February 22, 2019, for his alleged failure to properly enforce an Order of Protection.

27.     On or about May 28, 2019, ESHOO filed a written complaint with the Director of Human Resources for ARLINGTON HTS. setting forth his allegations of national origin and race discrimination, and hostile work environment.

28.     On or about July 25, 2019, ESHOO was apprised of charges brought against him arising out of a call that occurred on July 21, 2019, for his alleged failure to conduct a proper preliminary investigation of a Domestic Battery.

29.     On or about July 25, 2019, ESHOO was placed on Administrative Leave, with pay, pending the outcome of an Internal Affairs investigation of the alleged July 21, 2019 incident.

30.     On or about September 3, 2019, ESHOO received a memo from Mary Rath, Director of Human Resources for ARLINGTON HTS., regarding the conclusion of the alleged investigation into ESHOO's May 28, 2019 written complaint, which stated in part, without limitation:

> a.     "[W]hile there has been conduct by various members of the Police Department (what was described as "banter") which could be considered contrary to the Village's Anti-Harassment Policy, there has been no adverse employment action taken against you or negative treatment of you as result of your race, ethnicity and/or national origin."

> b.     "There is no dispute that former Police Chief Gerald Mourning's comment to you in October 2018, where he told you that you looked like a terrorist, was inappropriate."

9

c.    "In light of that comment and the significant amount of inappropriate banter that takes place within the Police Department, Ms. Underwood has recommended anti-harassment training for both supervisory and non-supervisory employees in the Department."

31.    On or about December 6, 2019, having requested FMLA leave to care for his father due to his serious health condition, ESHOO was provided a FMLA Notice of Eligibility and Rights Responsibilities (form WH-381 from the U.S. Department of Labor), from ARLINGTON HTS.' employer representative, Joan Bokina.  The FMLA Notice indicated that ESHOO was eligible for FMLA leave, and that he was required to provide a completed Certification of Health Care Provider for Family Member's Serious Health Condition by December 31, 2019.  The FMLA Notice also indicated that "Once we obtain the information from you as specified above, we will inform you, within 5 business days, whether your leave will be designated as FMLA leave and count towards your FMLA leave entitlement."

32.    On or about December 10, 2019, ESHOO was advised, through his union appointed attorney, that ARLINGTON HTS. was willing to put ESHOO on unpaid FMLA leave, but only if ESHOO immediately withdrew his EEOC Charge of Discrimination.

33.    On or about December 23, 2019, ESHOO returned to ARLINGTON HTS.' employer representative, Joan Bokina, the completed Certification of Health Care Provider for Family Member's Serious Health Condition, together with the completed Village of Arlington Heights Family and Medical Leave Act Employee Request form, which identified the dates of leave as December 6, 2019 through February 29, 2020.

34.    On or about January 6, 2020, ESHOO received a letter from Chief Pacora stating, "you are hereby terminated from employment with the Village of Arlington Heights effective January 6, 2020."

## COUNT I
### National Origin Discrimination – Hostile Work Environment
### Title VII and the Illinois Human Rights Act

35.     Plaintiff repeats and re-alleges paragraphs 1-34 as if they are set forth herein.

36.     Throughout Plaintiff's employment, Plaintiff was exposed to derogatory, degrading and inappropriate comments and behavior because of his national origin, Assyrian from Iraq, as described herein.

37.     The discriminatory behaviors and comments complained of herein were unwelcomed and made Plaintiff feel embarrassed, anxious and uncomfortable.

38.     The severe and pervasive discriminatory behaviors and comments complained of herein affected Plaintiff's ability to perform his job duties and created a hostile work environment.

39.     Management was present for, participated in, sanctioned and/or allowed many instances of national origin discrimination complained of herein.

40.     Defendant failed to implement any policy to prevent or eliminate national origin discriminatory behavior within the workplace.

41.     Plaintiff objected to and complained about the national origin discriminatory behavior and no remedial action was taken.

42.     Defendant's course of conduct showed a disregard for Plaintiff's right to have employment free from national origin discrimination.

43.     The foregoing constitutes impermissible national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and the Illinois Human Rights Act, 775 ILCS 5/2-101 et seq.

44.     The discriminatory acts that constitute the Defendant's pattern and/or practice of national origin discrimination have occurred both within and outside the liability period in this case.

45.     The above-describe unwelcome national origin discrimination created an intimidating, oppressive, hostile and offensive work environment, which affected the Plaintiff's emotional and physical well-being, and which interfered with the Plaintiff's job performance, and resulted in adverse employment actions being taken against the Plaintiff, including, limiting Plaintiff's opportunities for career development, suspending Plaintiff's employment, and terminating the Plaintiff's employment.

46.     Defendant's discriminatory conduct as described above, in violation of Title VII and the IHRA has caused the Plaintiff to suffer a loss of pay, benefits, and prestige.

47.     Because of Defendant's unlawful employment practices complained of herein, Plaintiff ESHOO suffered, and continues to suffer, from severe emotional distress, embarrassment, mental anguish and humiliation.

48.     Defendant's unlawful employment practices were intentional and done with malice or with reckless indifference to the Plaintiff's rights under Title VII and the IHRA.

WHEREFORE, the Plaintiff, ESHOO, respectfully requests:

    a.     All wages and benefits the Plaintiff would have received but for the discrimination;

    b.     Compensatory damages in an amount to be determined to compensate the Plaintiff for depression, humiliation, anguish, emotional distress, and defamation, caused by the Defendant's conduct;

    c.     The Defendant be required to pay prejudgment interest to the Plaintiff on these damages;

    d.     A permanent injunction enjoining the Defendant from engaging in the discriminatory practices complained of herein;

    e.     A permanent injunction requiring that the Defendant adopt employment practices and policies in accord and conformity with the requirements of Title VII, 42 U.S.C. §§ 2000e *et seq*.;

    f.     The Court retain jurisdiction of this case until such time as it is assured that the Defendant has remedied the policies and practices complained of herein and is determined to be in full compliance with the law;

    g.     An award of reasonable attorneys' fees, costs, and litigation expenses; and

    h.     Such other relief as deemed just and proper.

## COUNT II
### Race Discrimination – Hostile Work Environment
### Title VII and the Illinois Human Rights Act

49.    Plaintiff repeats and re-alleges paragraphs 1-34 as if they are set forth herein.

50.    Throughout Plaintiff's employment, Plaintiff was exposed to derogatory, degrading and inappropriate comments and behavior because of his race, dark olive, because he is Assyrian from Iraq, as described herein.

51.    The discriminatory behaviors and comments complained of herein were unwelcomed and made Plaintiff feel embarrassed, anxious and uncomfortable.

52.     The severe and pervasive discriminatory behaviors and comments complained of herein affected Plaintiff's ability to perform his job duties and created a hostile work environment.

53.     Management was present for, participated in, sanctioned and/or allowed many of the instances of race discrimination complained of herein.

54.     Defendant failed to implement any policy to prevent or eliminate racial discriminatory behavior within the workplace.

55.     Plaintiff objected to and complained about the racial discriminatory behavior and no remedial action was taken.

56.     Defendant's course of conduct showed a disregard for Plaintiff's right to have employment free from race discrimination.

57.     The foregoing constitutes impermissible race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and the Illinois Human Rights Act, 775 ILCS 5/2-101 et seq.

58.     The discriminatory acts that constitute the Defendant's pattern and/or practice of race discrimination have occurred both within and outside the liability period in this case.

59.     The above-describe unwelcome race discrimination created an intimidating, oppressive, hostile and offensive work environment, which affected the Plaintiff's emotional and physical well-being, and which interfered with the Plaintiff's job performance, and resulted in adverse employment actions being taken against the Plaintiff, including, limiting Plaintiff's opportunities for career development, suspending Plaintiff's employment, and terminating the Plaintiff's employment.

60.     Defendant's discriminatory conduct as described above, in violation of Title VII and the IHRA has caused the Plaintiff to suffer a loss of pay, benefits, and prestige.

61.     Because of Defendant's unlawful employment practices complained of herein, Plaintiff ESHOO suffered, and continues to suffer, from severe emotional distress, embarrassment, mental anguish and humiliation.

62.     Defendant's unlawful employment practices were intentional and done with malice or with reckless indifference to the Plaintiff's rights under Title VII and the IHRA.

WHEREFORE, the Plaintiff, ESHOO, respectfully requests:

a.     All wages and benefits the Plaintiff would have received but for the discrimination;

b.     Compensatory damages in an amount to be determined to compensate the Plaintiff for depression, humiliation, anguish, emotional distress, and defamation, caused by the Defendant's conduct;

c.     The Defendant be required to pay prejudgment interest to the Plaintiff on these damages;

d.     A permanent injunction enjoining the Defendant from engaging in the discriminatory practices complained of herein;

e.    A permanent injunction requiring that the Defendant adopt employment practices and policies in accord and conformity with the requirements of Title VII, 42 U.S.C. §§ 2000e *et seq.*;

f.    The Court retain jurisdiction of this case until such time as it is assured that the Defendant has remedied the policies and practices complained of herein and is determined to be in full compliance with the law;

g.    An award of reasonable attorneys' fees, costs, and litigation expenses; and

h.    Such other relief as deemed just and proper.

## COUNT III
### Retaliation
### Title VII and the Illinois Human Rights Act

63.    Plaintiff repeats and re-alleges paragraphs 1-34 as if they are set forth herein.

64.    In response to Plaintiff's protected reports, complaints and objections to national origin discrimination, race discrimination, and demeaning and discriminatory behavior and comments related to his national origin and race, Defendant took retaliatory actions which included, but are not limited to:

a.    subjecting Plaintiff to different, demeaning and more negative terms and conditions of employment that his similarly situated white American counterparts;

b.    subjecting Plaintiff to harsher and more demanding employment standards than his similarly situated white American counterparts;

c.    subjecting Plaintiff to unwarranted and unjust discipline;

d.    ostracizing Plaintiff from the work environment;

e.    limiting Plaintiff's opportunities for career development;

f.    suspending Plaintiff's employment;

g.     demanding that Plaintiff withdraw his EEOC Charge of Discrimination in order to obtain leave he was otherwise entitled to; and

h.     terminating the Plaintiff's employment.

65.     Management was present for, participated in, sanctioned, allowed, knew and/or should have known of such retaliation but took no remedial action.

66.     Defendant's conduct toward Plaintiff showed a willful and/or reckless disregard for Plaintiff's right to employment free from impermissible retaliatory conduct.

67.     Defendant failed to implement any policy that prevents impermissible retaliation for employees who complain about national origin discrimination, race discrimination and/or sexual harassment.

68.     The foregoing constitutes impermissible retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and the Illinois Human Rights Act, 775 ILCS 5/2-101 et seq.

69.     Because of Defendant's unlawful employment practices complained of herein, Plaintiff ESHOO has lost wages, benefits and career experience, and has suffered, and continues to suffer from severe emotional distress, embarrassment, mental anguish and humiliation.

WHEREFORE, the Plaintiff, ESHOO, respectfully requests:

a.     All wages and benefits the Plaintiff would have received but for the retaliation;

b.     Compensatory damages in an amount to be determined to compensate the Plaintiff for depression, humiliation, anguish, emotional distress, and defamation, caused by the Defendant's conduct;

c.     The Defendant be required to pay prejudgment interest to the Plaintiff on these damages;

d.     A permanent injunction enjoining the Defendant from engaging in the retaliatory practices complained of herein;

17

e.     A permanent injunction requiring that the Defendant adopt employment practices and policies in accord and conformity with the requirements of Title VII, 42 U.S.C. §§ 2000e *et seq*.;

f.     The Court retain jurisdiction of this case until such time as it is assured that the Defendant has remedied the policies and practices complained of herein and is determined to be in full compliance with the law;

g.     An award of reasonable attorneys' fees, costs, and litigation expenses; and

h.     Such other relief as deemed just and proper.

## COUNT IV
## Interference with the Right to take FMLA Leave

70.    Plaintiff repeats and re-alleges paragraphs 1-34 as if they are set forth herein.

71.    The FMLA guarantees eligible employees 12 weeks of leave in a 1-year period following certain events, including a family member's serious illness. 29 U.S.C. § 2612(a)(1).

72.    29 U.S.C. § 2615(a)(1) provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 C.F.R. § 825.220(a)(1).

73.    ARLINGTON HTS. is a covered employer under the FMLA because it is engaged in commerce or in an industry affecting commerce and employs 50 or more employees for each working day during each of 20 or more calendar workweeks in 2018 or the preceding calendar year. 29 U.S.C. § 2611(4)(A)(i); 29 C.F.R. § 825.104(a).

18

74.     ESHOO was an employee of ARLINGTON HTS. that was eligible for FMLA leave because he was employed by ARLINGTON HTS. for at least 12 months and worked at least 1,250 hours during the 12-month period prior to his request for FMLA leave.  29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110(a).

75.     ESHOO was eligible for FMLA Leave because he worked at least 1250 hours in a year at ARLINGTON HTS. worksite with at least 50 people in a 75-mile radius.  29 U.S.C. 2611(2)(B)(ii); 29 C.F.R. § 825.110(a).

76.     ESHOO was entitled to FMLA Leave because his father had a serious health condition and was incapable of self-care.  29 U.S.C. § 2611(7) and (12); 29 C.F.R. § 825.122(d).

77.     ESHOO's father was incapable of self-care because he required active assistance or supervision to provide daily self-care in three or more activities of daily living or instrumental activities of daily living while he was under treatment for his condition.  29 C.F.R. § 825.122(d)(1).

78.     A licensed physician certified that ESHOO's father's condition was a "serious health condition" within the meaning of the FMLA, a condition that ultimately claimed ESHOO's father's life.  29 U.S.C. § 2611(11); 29 C.F.R.§ 825.113.

79.     ESHOO gave appropriate notice of his need to be absent from work by providing notice verbally of his need for FMLA leave, by providing the completed FMLA Certificate of Health Care Provider for Family Member's Serious Health Condition (Form WH-380-F from the U.S. Department of Labor), and the completed Village of Arlington Heights Family and Medical Leave Act Employee Request form.  29 U.S.C. § 2612(e)(2); 29 C.F.R. § 825.303.

80.     ARLINGTON HTS. violated the FMLA because it failed to designate leave as FMLA-qualifying and failed to give notice of the designation to ESHOO within five business days after ARLINGTON HTS. acquired knowledge that ESHOO's leave may be for a FMLA-qualifying reason.  29 C.F.R. § 825.300(d); § 825.301(a).

81.     ARLINGTON HTS. violated the FMLA because it improperly failed to grant ESHOO's request for the FMLA leave he was entitled to under the FMLA.  29 U.S.C. § 2615; 29 C.F.R. § 825.220.

82.     ARLINGTON HTS. violated the FMLA because it improperly terminated ESHOO's employment with ARLINGTON HTS. because he requested leave he was entitled to under the FMLA.  29 U.S.C. § 2615; 29 C.F.R. § 825.220.

83.     Due to ARLINGTON HTS.' improper failure to grant ESHOO's request for FMLA leave, its improper termination of ESHOO's employment, and its other violations of the FMLA, ESHOO suffered mental anguish, emotional distress, humiliation, emotional pain and suffering, inconvenience, lost wages and benefits, damage to his reputation, and other consequential damages.

84.     The actions of ARLINGTON HTS. were intentional, willful, malicious and showed deliberate indifference to ESHOO's rights under the FMLA.

WHEREFORE, the Plaintiff, ESHOO, demands judgment against the Defendant, ARLINGTON HTS. for all relief necessary to make the Plaintiff whole, including but not limited to the following:

(a)     any wages, salary, employment benefits, or other compensation denied or lost to Plaintiff by reason of the violation;

(b)     interest calculated at the prevailing rate;

(c)     equitable relief such as employment, reinstatement or promotion;

(d)     litigation costs, expert witness fees, and reasonable attorneys'
fees; and

(e)     liquidated damages in the amount of actual damages plus interest.

(f)     Such other relief as deemed just and proper.

## COUNT V
## Discrimination/Retaliation for Exercising FMLA Rights

85.     Plaintiff repeats and re-alleges paragraphs 1-34 as if they are set forth herein.

86.     The FMLA guarantees eligible employees 12 weeks of leave in a 1-year period

following certain events, including the employee's own serious illness.  29 U.S.C. § 2612(a)(1).

87.     29 C.F.R. § 825.220(c) provides that "[t]he Act's prohibition against interference

prohibits an employer from discriminating or retaliating against an employee or prospective

employee for having exercised or attempted to exercise FMLA rights."

88.     ARLINGTON HTS. is a covered employer under the FMLA because it is

engaged in commerce or in an industry affecting commerce and employs 50 or more employees

for each working day during each of 20 or more calendar workweeks in 2018 or the preceding

calendar year.  29 U.S.C. § 2611(4)(A)(i); 29 C.F.R. § 825.104(a).

89.     ESHOO was an employee of ARLINGTON HTS. that was eligible for FMLA

leave because he was employed by ARLINGTON HTS. for at least 12 months and worked at

least 1,250 hours during the 12-month period prior to his request for FMLA leave.  29 U.S.C. §

2611(2)(A); 29 C.F.R. § 825.110(a).

90.     ESHOO was eligible for FMLA Leave because he worked at least 1250 hours in a year at ARLINGTON HTS. worksite with at least 50 people in a 75-mile radius.  29 U.S.C. 2611(2)(B)(ii); 29 C.F.R. § 825.110(a).

91.     ESHOO was entitled to FMLA Leave because his father had a serious health condition and was incapable of self-care.  29 U.S.C. § 2611(7) and (12); 29 C.F.R. § 825.122(d).

92.     ESHOO's father was incapable of self-care because he required active assistance or supervision to provide daily self-care in three or more activities of daily living or instrumental activities of daily living while he was under treatment for his condition.  29 C.F.R. § 825.122(d)(1).

93.     A licensed physician certified that ESHOO's father's condition was a "serious health condition" within the meaning of the FMLA, a condition that ultimately claimed ESHOO's father's life.  29 U.S.C. § 2611(11); 29 C.F.R.§ 825.113.

94.     ESHOO gave appropriate notice of his need to be absent from work by providing notice verbally of his need for FMLA leave, by providing the completed FMLA Certificate of Health Care Provider for Family Member's Serious Health Condition (Form WH-380-F from the U.S. Department of Labor), and the completed Village of Arlington Heights Family and Medical Leave Act Employee Request form.  29 U.S.C. § 2612(e)(2); 29 C.F.R. § 825.303.

95.     Within days of requesting FMLA leave and providing a completed written request form and medical provider certification regarding his FMLA leave request, ARLINGTON HTS. terminated ESHOO's employment for no legitimate reason.  29 C.F.R. § 825.220(c).

96.     ARLINGTON HTS. violated the FMLA because it improperly terminated ESHOO's employment with ARLINGTON HTS. because he requested leave he was entitled to under the FMLA.  29 C.F.R. § 825.220(c).

97.     In retaliation for ESHOO requesting FMLA leave he was entitled to under the FMLA, ARLINGTON HTS. demanded that ESHOO withdraw his EEOC Charge of Discrimination to receive his FMLA leave, and when ESHOO refused to withdraw his EEOC Charge of Discrimination, ARLINGTON HTS. terminated his employment.  29 C.F.R. § 825.220(c).

98.     ARLINGTON HTS. did not have a legitimate reason for terminating ESHOO's employment and but for ESHOO's request for FMLA leave he was entitled to under the FMLA, ARLINGTON HTS. would not have terminated ESHOO's employment.  29 C.F.R. § 825.220(c).

99.     Due to ARLINGTON HTS.' improper termination of ESHOO's employment, ESHOO suffered mental anguish, emotional distress, humiliation, emotional pain and suffering, inconvenience, lost wages and benefits, damage to his reputation, and other consequential damages.

100.    The actions of ARLINGTON HTS. were intentional, willful, malicious and showed deliberate indifference to ESHOO's rights under the FMLA.

WHEREFORE, the Plaintiff, ESHOO, demands judgment against the Defendant, ARLINGTON HTS. for all relief necessary to make the Plaintiff whole, including but not limited to the following:

(a)     any wages, salary, employment benefits, or other compensation denied or lost to Plaintiff by reason of the violation;

(b)     interest calculated at the prevailing rate;

(c)     equitable relief such as employment, reinstatement or promotion;

(d)     litigation costs, expert witness fees, and reasonable attorneys' fees; and

(e)     liquidated damages in the amount of actual damages plus interest.

(f).     Such other relief as deemed just and proper.

THE PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted,
PLAINTIFF,

s/     Brian R. Holman

_____
HOLMAN & STEFANOWICZ, LLC
By:     Brian R. Holman

Brian R. Holman (6211123)
Dennis H. Stefanowicz, Jr. (6210166)
HOLMAN & STEFANOWICZ
Attorneys for the PLAINTIFF
233 South Wacker Drive, Suite 9305
Chicago, Illinois 60606
(312) 258-9700
BRH@HS-ATTORNEYS.COM
DHS@HS-ATTORNEYS.COM

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Anfiny J. Eshoo<br>1112 N. Old Bridge Rd<br>Palatine, IL 60067 | From: Chicago District Office<br>230 S. Dearborn<br>Suite 1866<br>Chicago, IL 60604 |
|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2019-06246 | Robert Shelton,<br>Investigator | (312) 872-9725 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Julianne Bowman/msd*        8/6/2020

Enclosures(s)

Julianne Bowman,
District Director      (Date Mailed)

cc: **Robin Ward**
**In-House Counsel**
**Village of Arlington Heights**
**33 S Arlington Heights Rd**
**Arlington Hts, IL 60005**

Exhibit A



Exhibit B

# VISIT A GURDWARA



**You are Welcome** to **visit** your local **Gurdwara**. Enjoy some **meditation**, spiritually uplifting music and delicious food. Open **to all** of any background - with no expectations.



**1 BE DRESSED MODESTLY**

**2 REMOVE YOUR SHOES & SOCKS**

**3 COVER YOUR HEAD**

**4 WASH YOUR HANDS**

# WATCH US ON YOUTUBE

## Basics of Sikhi



 

 

### Why, What and How of Sikhi

- Hundreds of videos in English
- Questions asked by other faiths
- Gurbani explained (Nitnem & more)
- Intro course to Sikh history

 www.basicsofsikhi.com

 youtube.com/basicsofsikhi

 /everythings13.basicsofsikhi

 @everythings_13

 soundcloud.com/basicsofsikhi

 /basicsofsikhi

# 3 FACTS ABOUT SIKHI

The **5th** largest world religion



Exhibit C

## 1. THE MESSAGE OF SIKHI



**9 = 1**

Vaheguru

**1 Creator.** An Infinite Force **all around us** and the Source of **everything**.

**1** Human Race, **all equal**, each with the 1's light within. The **1's light** is **free of gender, religion, race, nationality** or **sexual orientation**. Anyone can be a **Sikh**. Our aim is to **connect** to the **1 inside** us...How?

**Connect** to the **1** through our Tenth Gate. A blissful **experience** of divine love found by **singing** praises in holy company, **meditation, honest living** and **serving humanity**.




## 2. THE TEN SIKH GURUS (1469-1708)

The **1st Guru** travelled to religious centres like **Tibet, Mecca** and **Sri Lanka**, spreading his message of experiencing the **1 creator** and **equality** and **freedom** for all humans. He even founded an ideal egalitarian community in **Punjab**.

The **3rd Guru** appointed 52 **women** preachers and gave them responsibilities to **lead** congregations. Women were given **equal** rights and seen as **spiritual** partners.

The **5th Guru** made the **Golden Temple** in **Amritsar**. It has 4 entrances, to welcome people of all traditions. One must descend into the Golden temple (**humility**) and walk the only path (**love**) to the inner temple (**God is inside us**).



The Gurus all promoted **religious freedom**. The **6th Guru** built a **mosque** for poor **Muslims** living within his city. In 1675, his son the **9th Guru**, went even further and gave his life to **protect** the religious freedom of **Hindus**.

## 3. INTERESTING FACTS



LORD · FORCE · DIVINE · MOTHER · BELOVED · FORGIVER · VAHEGURU · LIGHT OF LIGHTS · ALL POWERFUL · NIRVANA · FATHER · KHUDA · RAAM · ALLAH · BLISS · ONE

The **11th Guru** is **scripture**, called the **Guru Granth Sahib**. Compiled and **sealed** by the **Gurus** themselves, it was given **Guruship** in 1708. It contains **divine wisdom** of Saints of **different religions** and **backgrounds**. It is seen as **Truth** revealed **directly** from the **1**.

The **Guru Granth Sahib** is **poetry**, divided by **music** not chapters. Its not just instructions. **Singing** these divine words **awakens** our soul. The **Gurus** were master **musicians** and even **invented** instruments.



**Free food** for **all** is a core principle of Sikh **Gurdwaras**. We all sit as **equals** to eat food prepared by volunteers.

**FREE**

 basicsofsikhi.com       /everythings13.basicsofsikhi      youtube.com/basicsofsikhi



Exhibit D



# Dairy Goat Management



Best Management Practices

Exhibit E



Exhibit F



Exhibit G



